UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BELEN GONZALES, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:18-CV-43 |
| | § | |
| MATHIS INDEPENDENT SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiffs, B.G. and P.G. (Parents), Individually and on behalf of their minor children, C.G. and D.G. (Children), filed this action against Mathis Independent School District (MISD), alleging violations of their religious and constitutional rights by banning C.G. and D.G. from participation in MISD's extra-curricular activities. D.E. 1-3, 8. Before the Court is MISD's Motion for Summary Judgment (D.E. 20), together with Plaintiffs' response (D.E. 21, 22) and MISD's reply (D.E. 24). For the reasons set out below, the motion for summary judgment is GRANTED IN PART and DENIED IN PART.

### STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id*. Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S.

at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

## FACTS

Parents are Hispanic and practice the Roman Catholic religion. As an expression or exercise of their faith and heritage, and in a promise (promesa) to God, Parents have kept a strand of hair on the back of the Children's heads uncut since birth. More recently, the Children have adopted that promise as their own affirmation of faith and heritage and continue to maintain the single long braid down their backs. However, Parents admit that the promise is not dictated by the Catholic religion and they could change it at any time. D.E. 22, pp. 25-26, 54.

C.G. testified that his parents made the promise because when he was younger, he was sick and they made the promise to keep him safe and out of harm's way. After the promise, his health improved. Now, he considers the promise to be his to keep as well as theirs and if he cut the hair, he would disappoint Jesus or get punished. D.E. 22, p. 34. But if his parents took back the promise, he would cut his hair and play football. D.E. 22, p. 35. D.G. testified that his braid represents his faith to God. D.E. 22, p. 43. It started

out as his parents' promise but it became his, as well, at the beginning of his sixth grade year. D.E. 22, p. 47. Breaking the promise would be a sin. D.E. 22, pp. 61, 82.

C.G. admitted that neither his father nor his priest wear a braid and that he does not consider it to be an expression of his Hispanic heritage. D.E. 20-1, pp. 29-30. P.G. acknowledged that you cannot tell whether someone is Catholic because he has a braid. D.E. 20-1, p. 72. And a promesa is not so much a Catholic decision, but a personal decision. D.E. 20-1, p. 74.

Parents have repeatedly documented the uncut hair as a religious practice as the Children have advanced through MISD's schools. Until 2017, MISD granted Plaintiffs a religious exemption from the school dress code and its hair grooming policy to accommodate the promesa and the associated braids. MISD thus permitted the Children to fully participate in educational and extra-curricular activities. More recently, however, MISD notified Plaintiffs that the Children would not be permitted to participate in any extra-curricular or UIL (University Interscholastic League) activities unless they complied with the hair grooming policy, prompting this legal action.

According to the Grooming and Dress provision of the MISD 2017-2018 Extra Curricular Handbook,

> Students will follow the dress code that is in the student handbook. In addition, students will be required to follow the sponsor/coaches' rules that may be stricter than those stated in the handbook. Your appearance should at all times reflect class and pride in yourself and in our extra-curricular programs.

D.E. 10, p. 13. According to the Student Handbook, all males must cut their hair so as not to touch the eyebrows in front or extend beyond the top of the collar of a standard shirt in back and may not exceed the top of the ear on the sides. The hair may not be pinned, curled, or gelled up to avoid the rule. D.E. 1-3, p. 12.

According to the summary judgment briefing, it appears that MISD is currently allowing the Children to participate in Student Council, Art Club, and a Video Game and Programming Club. D.E. 20-1, p. 44. They are also permitted to practice with the football team. In fact, MISD now states that the Children will only be excluded from UIL activities. *See* D.E. 20-1, p. 46, 48, 71. That meant that D.G. was taken off the seventh grade UIL Science Team for his school. D.E. 22, p. 48. It remains unclear why D.G. was denied participation in at least one field trip for Student Council and C.G. was not allowed to participate in a school band concert, which affected his academic grade. D.E. 22, pp. 46, 79.

To justify its application of the grooming policy, MISD states, "When we send our students out and represent Mathis ISD we hold our students to a higher level of what we expect from them." D.E. 20-1, p. 7 (Angie Trejo). The basis for the policy is a general understanding of community standards. D.E. 20-1, p. 14 (Superintendent Benny Hernandez); *see also* D.E. 20-1, p. 84 (Ricardo Cortez, Jr.). More specifically, Superintendent Hernandez testified that if a girl wanted to play football, she could do so and would not be required to cut her hair because the grooming policy is a community standard and it treats boys and girls differently, without reference to the activities involved. D.E. 22, p. 13.

The policy is only about appearances in representing the school, rather than incorporating any safety concerns or UIL policies. D.E. 22, p. 14-15. And the Parents acknowledge that the grooming rules are religion-neutral. As former MISD students, themselves, they agreed that the grooming policy has been the same for decades and that they were aware of it when they made the promesa. D.E. 20-1, pp. 18-19, 60-61.

## DISCUSSION

### A. Free Exercise of Religion

The First Amendment provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. It is undisputed that pursuant to the Fourteenth Amendment, the prohibition extends to rules imposed by state-authorized actors, such as public school districts. U.S. Const., amend. XIV. A rule violates the Free Exercise Clause when it unduly burdens a person's adherence to a sincerely held religious belief. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447 (1988).

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981).

In 1990, the Supreme Court clarified its approach to First Amendment Free Exercise cases and eliminated the requirement that state action must be the least

restrictive means of achieving a compelling state interest. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990). Instead, "[t]he government does not impermissibly regulate religious belief . . . when it promulgates a neutral, generally applicable law or rule that happens to result in an incidental burden on the free exercise of a particular religious practice or belief." *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 135 (5th Cir. 2009) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) and *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)). The *Smith* opinion has been described as eliminating the strict scrutiny standard of review in free exercise cases. *See generally, Fairbanks v. Brackettville Bd. of Educ.*, 218 F.3d 743 (5th Cir. 2000).

Thus, to prevail on their claim for violation of the Free Exercise Clause of the First Amendment, Plaintiffs must show that they have a sincerely held religious belief that is burdened by a rule that is either non-neutral or outside the regulatory power of MISD. According to MISD, the claim fails because a promesa is too individual and too mutable to constitute a religious belief and the denial of UIL participation is not a cognizable burden on any such rights. Instead, the grooming policy is a neutral, generally applicable rule that does not infringe on religious freedoms.

**Sincerely Held Religious Belief**. MISD contends that a promesa is neither sincere nor religious because Plaintiffs testified that the promise could be changed at their discretion and allowing the Children's hair to grow is not an established tenet of their Catholic faith. As a matter of law, MISD is not permitted to challenge whether Plaintiffs' practice is an approved feature of an established religion. *United States v. Ballard*, 322

U.S. 78, 86-87 (1944) ("They may not be put to the proof of their religious doctrines or beliefs."). "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). It is enough that Plaintiffs treat the promesa as a promise to God that if broken would be a sin, would disappoint Jesus, and would result in divine punishment.

The sincerity with which Plaintiffs hold their religious beliefs is, in contrast, a fact question. *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 833 (1989); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 138 n.2 (1987). However, there is sufficient evidence of record to establish a disputed issue of material fact that Plaintiffs hold their promesa as a sincere belief. They have been unwavering in the promise since the Children's respective births. The Parents have taught the Children the importance of keeping their solemn vows with the promesa as an important life lesson. While they have admitted that the promise could be abandoned or changed, they also testified that doing so would constitute a sin and have religious consequences.

By granting the religious exemption to Plaintiffs for many years, based upon their claim that they made a sacred promesa not to cut the Children's hair, MISD acknowledged the sincerely held religious belief. MISD has not defeated Plaintiffs' claim to the extent that it is based upon a sincerely held religious belief.

**Undue Burden**. MISD claims that it defeats Plaintiffs' claim under the *Smith* test because its dress code, with its hair grooming policy, is within its general jurisdiction to regulate its school image and is applied neutrally to all students. Plaintiffs do not dispute

this. There is no evidence that the policy singles out or targets Plaintiffs' or anyone else's religious beliefs. And the policy went into effect long before Plaintiffs first made a promesa. Thus the incidental burden that the hair grooming policy places on Plaintiffs' right to the free exercise of religion is insufficient to support their First Amendment Free Exercise claim. *Smith*, 494 U.S. at 878–79.

**Conclusion**. As a matter of law, Plaintiffs cannot prevail on their claim that MISD violated their rights under the First Amendment's Free Exercise Clause because the policy is within its purview and is applied neutrally. The Court GRANTS the motion for summary judgment (D.E. 20) to the extent that it challenges this claim.

### B. TRFRA (Texas Religious Freedom Restoration Act)

The State of Texas is one of many jurisdictions that enacted legislation in the form of a religious freedom restoration act to restore the strict scrutiny test to statutory free exercise cases, effectively abrogating *Smith* on the state level. Tex. Civ. Prac. & Rem. Code Ann. § 110.003; *Barr v. City of Sinton*, 295 S.W.3d 287, 296 (Tex. 2009) (outlining the history of constitutional Free Exercise jurisprudence and the impetus behind the TRFRA). The factors involved in proving a claim under the TRFRA are: "(1) whether the government's regulations burden the plaintiff's free exercise of religion; (2) whether the burden is substantial; (3) whether the regulations further a compelling governmental interest; and (4) whether the regulations are the least restrictive means of furthering that interest." *Merced v. Kasson*, 577 F.3d 578, 588 (5th Cir. 2009) (citing *Barr,* 295 S.W.3d at 299).

**Free Exercise of Religion**.  The first factor incorporates the same analysis that pertains to a claim under the Free Exercise Clause of the United States Constitution. According to the definition section of the TRFRA:

> "Free exercise of religion" means an act or refusal to act that is substantially motivated by **sincere religious belief**. In determining whether an act or refusal to act is substantially motivated by sincere religious belief under this chapter, it is not necessary to determine that the act or refusal to act is motivated by a central part or central requirement of the person's sincere religious belief.

Tex. Civ. Prac. & Rem. Code § 110.001(a)(1) (emphasis added).  As with constitutional free exercise cases, in TRFRA cases, "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."  *Barr*, 295 S.W.3d at 300 (citing *Smith*, 494 U.S. at 886-87).

MISD's hair grooming policy would require the Children to cut their hair, which they have worn uncut as a promesa, a religious promise.  For the same reasons set out above, the Court finds that the policy affects Plaintiffs' free exercise of religion.

**Substantial Burden**.  There are two basic components to finding a burden to be substantial:  (1) real, as opposed to merely perceived; and (2) significant, as opposed to trivial.  *Barr*, 295 S.W.3d at 301.  The *Barr* opinion notes that some courts have made a distinction between a burden on a person's beliefs as opposed to a burden on his conduct. *Id*.  This perspective tends to place the court in the position of crossing the line into determining the importance of particular conduct to the central tenets of the religion.  To avoid that conundrum, *Barr* instructs courts to measure "the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression."  *Id*.

That measurement is taken from the person's perspective, not the government's. *Id*. And it is a fact-specific inquiry. *Id*. at 302.

MISD's hair grooming policy requires cutting the Children's hair. This would fully eliminate their religious effort of maintaining a promesa, now 14 years strong. *See A.A. ex rel. Betenbaugh v. Needville Indep. Sch.*, 611 F.3d 248, 264 (5th Cir. 2010) (writing, "Requiring A.A. to cut his hair—a total ban of conduct—would also likely constitute a substantial burden," but noting that the policy in that case allowed for alternative styling of the hair to conceal its length). From Plaintiffs' perspective, it is no comfort that hair can grow back or that they could shift their devotion to some other expression. The damage will have been done. The promise will have been broken. While their promesa is only one expression of their religious beliefs, it is an important one for their entire family. That burden is real and significant; it is thus substantial.

MISD argues that there is no cognizable burden to Plaintiffs because this case is really only about UIL participation. And it cites a number of cases that hold that UIL participation is not a benefit of constitutional magnitude. First, this argument misplaces the focus, concentrating on the value of the widely available state benefit that is withheld rather than on the price MISD seeks to exact in exchange for conferring that benefit—a burden to the fundamental right of the free exercise of religion. Second, none of the UIL cases that MISD cites are TRFRA cases; they are easily distinguished. Third, the record is unclear that UIL participation is the only activity Plaintiffs stand to lose. The first issue has already been addressed in this section. The Court now turns to the second and third.

The UIL cases are distinguishable. Chronologically first, and the only case MISD cites that addresses any religious exercise issue, is *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 158 (5th Cir. 1980). *Walsh* did not involve the UIL, but a similarly constituted voluntary association of public, private, and parochial high schools regulating interscholastic athletic competitions in the State of Louisiana. At issue was the transfer rule, which prevented the student's participation in league athletics for one year after the student transfers out of his home district.

Walsh's parents left their home district and enrolled the student in a Lutheran school. When the association's rule required the student to sit out of athletics for a year, they sued the association. The court wrote:

> The encroachment of the transfer rule on the free exercise of religion is both limited in scope and insignificant in magnitude. The transfer rule does not deny these parents or their children the right to actively practice the Lutheran faith. Similarly, it neither prohibits a parent from enrolling his child in Lutheran High School nor interferes with the ability of such a child to obtain the religious education provided by that school. The rule merely prevents a child from participating in interscholastic athletic competition during his ninth grade year.

*Id.* at 158. However, the *Walsh* opinion notes that it is factually significant that the student was not prohibited from participating in all athletic activities. He could still participate in intramural athletic competition and practice with the Lutheran High School varsity athletic teams. And the limit on league competition was for only one year. No other school-related activities, such as field trips and concerts, were affected.

Moreover, the *Walsh* opinion balanced the transfer rule against the compelling interest and least restrictive means factors:

> Although the de minimis nature of the burden placed on the plaintiffs' free exercise of religion is sufficient to reject plaintiffs' first amendment challenge to the LHSAA transfer rule, . . . we further find the application of the transfer rule, together with its incidental burden on the free exercise of religion, is constitutionally justified by the magnitude of the state's interest in the regulation and the lack of an equally effective and workable alternative.

*Id*. The opinion's qualifications (limited scope of deprivations and compelling state interest) are caveats that give the Court pause.

MISD's later cases do not eliminate these concerns. In fact, most address the inapposite scenario of due process or equal protection challenges to UIL eligibility rules or decisions. They find no property interest to support the due process claims and they find no issue of fundamental rights or suspect class, leading to the application of only a rational basis standard. *See Kite v. Marshall*, 661 F.2d 1027, 1029 (5th Cir. 1981) (finding it sufficient that UIL athletic eligibility rules promote fairness and competition when prohibiting students who participate in summer camps).[1] As noted above, the TRFRA reinstated the strict scrutiny standard. And fundamental religious freedom is involved here.

---

[1] *See also Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 850 (2002) (applying rational relation test with respect to Fourth Amendment and privacy rights challenges to suspicionless drug testing as a condition for participation in athletics); *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 27 (5th Cir. 1997) (disciplinary transfer to alternative school that did not offer athletics was appropriate response to compelling safety concerns and student had no property interest in athletics as opposed to education); *Hardy v. Univ. Interscholastic League*, 759 F.2d 1233, 1234–35 (5th Cir. 1985) (UIL transfer rules); *Niles v. Univ. Interscholastic League*, 715 F.2d 1027, 1031 (5th Cir. 1983) (UIL transfer rules); *Eanes Indep. Sch. Dist. v. Logue*, 712 S.W.2d 741, 742 (Tex. 1986) (UIL playoff decision based on rule related to weather or other impediment to playing game).

The scope of the deprivations in this case is unclear. MISD has briefed the case as if its only restriction is on UIL competitive events. However, Plaintiffs have produced uncontroverted evidence that, in the past, MISD has applied its grooming policy to exclude the Children from non-UIL events, such as a field trip and a class concert—thus expanding the burden beyond the *Walsh* scope. And the UIL deprivation here is permanent, rather than for only one year. The Court cannot resolve, on this record, whether the scope of the deprivations is, in practice, limited to UIL activities as MISD states.

**Compelling State Interest**. When the religious burden is substantial and there is some basis for treating the state deprivation as relatively light, the remaining factors take on greater significance: whether the policy addresses a compelling state interest and whether it is the least restrictive means for doing so. While the burden of proof is on MISD, its briefing is silent on these issues. *See Barr*, 295 S.W.3d at 307-08. Assuming that it had defeated Plaintiffs' TRFRA claim on the "substantial burden" factor, it did not address its own alleged interests in imposing its grooming rule.

While the elements of a TRFRA claim are set out in a list of four items, courts are to balance them together any time the burden to religious practices is real and significant. *See generally, Barr*, 295 S.W.3d at 306; *Merced*, 577 F.3d at 592. Just as MISD attempts to diminish Plaintiffs' interest by arguing that it is only UIL participation of negligible value that is at issue here, it defeats its own claim to a compelling state interest. In other words, if UIL participation is so inconsequential, one can ask why MISD persists in

enforcing its highest level of grooming (at the expense of Plaintiffs' fundamental religious rights) as a condition for participation.

The only argument that seeps through from MISD's briefing of the other claims is that the grooming policy represents the district's community values that boys and girls should sport gender-appropriate appearances. As the Fifth Circuit wrote in *A.A.*, "Superintendent Rhodes's concern for aesthetic homogeneity . . . is insufficiently compelling to overtake the sincere exercise of religious belief." *A.A.*, 611 F.3d at 271. And while the grooming policy has been in place for decades, one might conclude just as easily that it is antiquated as that it is time-honored.

**Least Restrictive Means**. Without more, the Court is hard-pressed to evaluate MISD's goals and means as appropriately justifying the burden (as it ultimately may be defined). MISD did not challenge the claim on the basis that the policy reflects the least restrictive means for advancing community values. Plaintiffs have thus been prevented from arguing that MISD's policy either ignored alternatives or banned them (prohibiting pinning, curling, or gelling). It is not enough that MISD has accommodated Plaintiffs' promesa by extending an exemption to other activities. The question before the Court is whether there are alternative means that can effectively accommodate MISD's goals.

**Conclusion**. MISD has not satisfied its burden of demonstrating, as a matter of law, that Plaintiffs cannot prevail on one or more elements of their TRFRA claim. The Court DENIES the motion for summary judgment (D.E. 20) to the extent that it challenges this claim.

## C. Freedom of Expression

The general right to freedom of expression applies to conduct revealing an intent to convey a particularized message, and the likelihood that the message would be understood by those exposed to it. *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001). Visibly wearing one's hair in a particular manner is capable of communicating one's religion or heritage. *See, A.A. ex rel. Betenbaugh,* 701 F. Supp. 2d at 882 (S.D. Tex. 2009), *aff'd*, 611 F.3d 248, 264 (5th Cir. 2010) (addressing Native American braids and basing the decision on statutory protections for religious freedom rather than on constitutional grounds). MISD challenges Plaintiffs' claim on both ends of the claim of expression: (1) that the uncut hair communicates Plaintiffs' religious faith or Hispanic heritage; and (2) that others who see the uncut hair understand it as an expression of such.

**Sending**. As is apparent from the foregoing discussion, there is certainly a disputed issue of material fact that Plaintiffs intend the braids to communicate their faith and heritage. Thus the Court rejects MISD's first challenge to the claim of a violation of the freedom of expression.

**Receiving**. It is much less clear, however, that either message (faith or heritage) is received by the general public or any part thereof. Plaintiffs' argument that people understand their message is effectively unsupported. Some statements in the briefing that assert receipt of the message are not followed by any factual or legal citation. Those that carry a legal citation do not direct the Court to any case that applies to this message,

which is distinguishable from that of Native Americans, for example.[2] The fact that a hairstyle can convey a message is not enough to show that this particular hairstyle conveys the particular religious or ethnic message Plaintiffs seek to send.

Plaintiffs' few citations to record evidence point to discussions that do not involve anyone understanding Plaintiffs' promesa. Instead, they address the reason for their practice and obliquely support what message they might want to send. But they do not address whether their particularized message is actually received.

**Conclusion**. MISD has challenged Plaintiffs' freedom of expression claim on the basis that others do not perceive the Children's uncut hair as sending a particular message. Because this is a fact question and Plaintiffs have produced no evidence to raise a disputed issue of material fact in that regard, the Court GRANTS the motion to dismiss (D.E. 20) to the extent that it challenges the claim based on Plaintiffs' right to freedom of expression.

**D. Due Process Liberty Interest in Parenting Children**

Under the Due Process Clause of the Fourteenth Amendment, parents have a fundamental right to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (collecting cases). This includes teaching moral standards, religious beliefs, and good citizenship. *Bellotti v. Baird*, 443 U.S. 622, 637-38 (1979). "[T]he values of parental direction of the religious upbringing

---

[2] *Johnson*, 491 U.S. at 399 (expression was flag-burning); *Canady*, 240 F.3d at 438 (mandatory school uniforms and non-specific challenge to communicative and symbolic use of clothing); *A.A. ex rel. Betenbaugh*, 701 F. Supp. 2d at 883 (use of hair to express particularized Native American religious and ethnic meaning).

and education of their children in their early and formative years have a high place in our society." *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972).

MISD challenges Plaintiffs' substantive due process claims solely by analogizing this case to *Kite,* 661 F.2d at 1027. In *Kite*, the Fifth Circuit held that the right at issue—to attend a summer athletic camp—was not a fundamental right. If there is no fundamental constitutional right at stake, then the state action need only satisfy the rational relationship test. *Id*. Consequently, fairness and competition—rational bases for visiting adverse consequences on those who attended expensive camps to get an unfair advantage—could justify the UIL rule.

The analogy to this case does not hold. Here, the parental childrearing right is a fundamental right. *See, Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925). And the specific childrearing issue here pertains to the exercise of religion, which itself is a fundamental right. *Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940). MISD did not brief the test to be applied, much less demonstrate that MISD satisfied the test or, if the burden lies on Plaintiffs, that Plaintiffs are unable to satisfy it.

**Conclusion**. MISD has not satisfied its summary judgment burden of proof to demonstrate that it is entitled to judgment as a matter of law on Plaintiffs' claims for violation of their substantive due process right to guide the religious and moral training of their children. The Court DENIES the motion for summary judgment (D.E. 20) to the extent that it challenges this theory.

## DECISION

For the reasons set out above, MISD's motion for summary judgment (D.E. 20) is GRANTED IN PART and DENIED IN PART. Plaintiffs' claims for violation of their First Amendment right to the free exercise of religion and freedom of expression are DISMISSED. This case may proceed on Plaintiffs' claims for violation of the TRFRA and their childrearing rights under the Fourteenth Amendment substantive due process provision.

ORDERED this 27th day of December, 2018.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE